ERNEST AMOS, as Comptroller of the State of Florida, and W. V. KNOTT, as Treasurer of the State of Florida, *Appellants*, v. JOHN E. MATHEWS, *Appellee*.

Division A.

TERRELL, C. J.—The extraordinary session of the legislature for 1929 enacted Senate Bill One, which is now Chapter 14486, Laws of Florida, and Senate Bill Five,

which is now Chapter 14575, Laws of Florida. Both laws are in *pari materia* and will be referred to hereafter as "Senate Bill One" and "Senate Bill Five."

Senate Bill One was approved and became effective June 21, 1929. It creates a depository for certain funds of counties and special road and bridge districts, authorizes the issuance of refunding bonds by said counties, and special road and bridge districts, provides for a Board of Administration composed of the Governor, Comptroller, and State Treasurer, whose duties shall be to administer and disburse such funds as come into their hands under the terms of the said Act. ·It also embraces other provisions immaterial to this treatment.

Senate Bill Five was approved June 21, 1929, and became effective July 1, 1929. It amends Sections One and Four of Chapter 9120, Acts of 1923, Laws of Florida, the same being an Act imposing a license tax on gasoline or other like products of petroleum, providing for reports of sale of such commodities to the Comptroller of the State of Florida and providing for the distribution of the moneys derived from such tax and fixing a penalty for the violation of the provisions of said Act. Senate Bill Five is not materially different from the Acts passed in 1921, 1923, 1925, and 1927 affecting the same subject matter except in the method of the levy of the taxes and the apportionment of the proceeds of the tax collected. The pertinent provisions of both Senate Bills One and Five will be quoted and treated later in this opinion. A fuller statement of them here would, therefore, be superflous.

On July 5, 1929, John E. Mathews filed his bill of complaint in the Circuit Court of Leon County against Ernest Amos as Comptroller and W. V. Knott as State Treasurer seeking to restrain them from undertaking any proceedings authorized under Senate Bill One and to restrain the

levy, collection, and apportionment of the tax as authorized by Senate Bill Five. The prayer of the bill of complaint seeks to strike down Senate Bills One and Five on various and sundry constitutional grounds. The chancellor overruled the demurrer to the bill of complaint and upheld the legality of the levy as to each and all taxes imposed. He further decreed that the second and third gas taxes were county taxes, that the apportionment of the third gas tax was in violation of Section Five, Article Nine of the Constitution but that under the terms of Senate Bill Five the second gas tax and the third gas tax should be apportioned to the counties in the proportion collected in such counties. It was also decreed that the fourth gas tax was a State tax, one third of which should be apportioned to the counties in equal parts for road purposes and that two thirds thereof should be apportioned to the counties for public school purposes as provided by Section Three and One-Half ($3\frac{1}{2}$) of Chapter 14573, Acts of 1929. Defendants below appealed from that decree and complainants filed cross assignments of error.

Coincident with the filing of the bill of complaint in the Circuit Court of Leon County, the State on relation of the Attorney General filed in this Court a motion for leave to file an information in the nature of a *quo warranto* against Doyle E. Carlton as Governor, Ernest Amos as Comptroller, and W. V. Knott as State Treasurer, who ex officio are members of and constitute the Board of Administration, and Ernest Amos as Comptroller, and W. V. Knott as State Treasurer, and ex officio treasurer of each of the counties of the State of Florida as provided in Senate Bill One. This motion was granted and a rule was issued directed to the said Doyle E. Carlton as Governor, Ernest Amos as Comptroller, and W. V. Knott as State Treasurer, who ex officio are members of and constitute the Board of

Administration, and Ernest Amos as Comptroller, and W. V. Knott as State Treasurer, and ex officio treasurer of each of the counties of the State of Florida as provided in said Senate Bill One, requiring them to show cause on Monday, the 15th day of July, A. D. 1929, why the said writ of *quo warranto* as prayed for should not issue, requiring them to show by what warrant or authority they exercise the offices, franchises, and powers as aforesaid.

There was a demurrer to the information in the *quo warranto* suit which raised substantially the same questions as the assignments of error in the injunction suit. The whole matter is now before us on appeal from the decree of the chancellor in the injunction suit in the demurrer to the information in the *quo warranto* suit. Both causes raising substantially the same questions will be treated and decided in this opinion.

With the exception of the assignments of error predicated on vagueness, indefiniteness, uncertainty, and ambiguity every question brought here for our determination is grounded on the asserted violation of some provision of the State or Federal Constitution. In the decision of such questions both bench and bar must at all times be impressed with the weight of the following canons of statutory construction: (1) On its face every Act of the legislature is presumed to be constitutional; (2) Every doubt as to its constitutionality must be resolved in its favor; (3) If the Act admits of two interpretation one of which would lead to its constitutionality and the other to its unconstitutionality the former rather than the latter must be adopted; (4) The constitutionality of a statute should be determined by its practical operation and effect; (5) In determining its constitutional validity courts should be guided by its substance and manner of operation rather than the form in which the Act is cast; and (6) After in-

dulging all presumptions in favor of the Act if it is found to be in positive conflict with some provision of organic law it becomes the duty of the court to strike it down. With these principles to guide us we will now analyze and decide the question brought here for our determination.

It is first contended that Senate Bills One and Five are void for vagueness, ambiguity, indefiniteness, and uncertainty.

Unaccompanied by a bill of particulars this criticism is abstract and nebulous. It cannot be successfully lodged against Senate Bill One. We find it to be clear, direct, and positive in terms and its import not subject to reasonable doubt. So much cannot be said in support of Senate Bill Five. Nothing can be said in commendation of its draughtmanship. It is crude and incoherent but out of it all we think that it is quite possible for men of common sense and reason to divine the legislative intent and to provide the means necessary for its execution. This we understand to be the test that the instant challenge must overcome.

Where an Act of the legislature is challenged on the ground of vagueness, indefiniteness, uncertainty, or ambiguity it must be so vague, indefinite, uncertain, or ambiguous as a whole that men of common sense and reason are unable to determine with any degree of certainty what the legislature intended, or that its terms are so conflicting or inconsistent that it becomes meaningless. It must be so meaningless and incapable of being given effect under any reasonable interpretation that may be placed on it that the courts would not hesitate to hold it void. The fact that it may offend against the rule in some of its provisions is not enough so long as it is capable of execution in its essential provisions and does not impinge on some constitutional provision. Curry v. Lehman, 55 Fla. 847, 47 So.

R. 18; State v. Johns, 92 Fla. 187, 109 So. R. 228; State v. Beardsley, 84 Fla. 109, 94 So. R. 660. It is not alleged how or in what manner Senate Bills One and Five are subject to the assault made on them but applying the test here stated it does not appear that either statute is amenable to this attack.

It is next contended that Senate Bills One and Five violate Section 16 of Article 3 of the Constitution in that they are misleading, that the subject matter is not briefly expressed in the title and that they embrace more than one subject and matter properly connected therewith.

Determination of this contention necessitates an examination of both the title and body of the Acts assaulted. It is not practicable to set out the body of said Acts in *haec verba*. The title to Senate Bill One is as follows:

"AN ACT Providing for Depository of Sinking Funds and Delinquent Taxes and Other Moneys for Road and Bridge Districts of the State or Otherwise, Authorizing the Issuance of Refunding Bonds by Said Counties and Special Road and Bridge Districts, and Providing for the Creation of a Board of Administration and the Disbursement of Such Funds to Pay Such Indebtedness and the Use of Any Surplus in Any County for the Construction and Maintenance of Roads and Bridges."

The title to Senate Bill Five is as follows:

"AN ACT to Amend Sections 1 and 4 of Chapter 9120, Laws of Florida, Acts of 1923, Entitled 'An Act Imposing License Tax Upon Gasoline or Other Like Products of Petroleum; Providing for Reports of Sale of Such Commodities to the Comptroller of the State of Florida; Providing for the Distribution of the

Monies Derived from Such Tax and Fixing a Penalty for the Violation of the Provisions of This Act, and to Repeal all Laws in Conflict With This Act,' as Amended by Section 1 of Chapter 10025, Laws of Florida, Acts of 1925, and as Further Amended by Chapter 12037, Laws of Florida, Acts of 1927, Said Sections 1 and 4 Being Sections 1153 and 1156 of the Compiled General Laws of Florida, 1927.''

This Court is committed to the well recognized doctrine that the title of a bill need not be an index to the contents of the Act. If it fairly gives notice of the subject of the Act so as to reasonably lead one to an inquiry into its contents that is sufficient. State ex rel. Moodie v. Bryan, 50 Fla. 293, 39 So. R. 929; Ex parte Pricha, 70 Fla. 265, 70 So. R. 406; In re DeWoody, 94 Fla. 96, 113 So R. 677; Lewis v. Leon County, 91 Fla. 118, 107 So. R. 146.

The specific criticism of the title to Senate Bill One is that it appropriates money from the State treasury and does not give notice of such appropriation. It is hardly necessary to say that Senate Bill One is now legislation and that its primary purpose is to provide a practical economic system to administer certain funds provided for counties and special road and bridge districts for road and bridge purposes. This purpose is accomplished through a Board of Administration composed of State officers which it creates. It does not levy a tax or make an appropriation, it administers funds provided by other statutes, abolishes bond trustees, withdraws certain powers from Boards of County Commissioners and authorizes the issuance of refunding bonds, but these are mere incidents to the main purpose of the Act. Fine v. Moran, 74 Fla. 417, 77 So. R. 533. We think the title to Senate Bill One is clear, comprehensive, and fair, and that both title and body impart a singleness of aim.

Senate Bill Five, as its title indicates, imposes a license tax on the sale of gasoline and amends all previous legislation on the same subject matter. Chapter 8411, Acts of 1921, Laws of Florida, was the initial Act imposing a license tax on gasoline and other like products of petroleum. At each recurring session of the legislature the parent Act has been amended with little or no variation in the title except to indicate the amendments which have generally been limited to an enlargement of the tax. The machinery for its collection has in some respects been improved but not materially changed. In Amos v. Gunn, 84 Fla. 285, 94 So. R. 615, the title and other features of Chapter 8411, Acts of 1921, were considered by this Court and held good. At least four succeeding legislatures have approved the title to Chapter 8411, Acts of 1921, and have re-enacted it, immense sums have been collected and distributed under it and while this fact alone would not foreclose the question of its validity we think it invulnerable to the attack made on it. In State ex rel. Bonsteel v. Allen, 83 Fla. 214, 91 So. R. 104, this Court in dealing with a like situation held that where the title of an Act amendatory of the Revised General Statutes gives the numbers of the sections of the law designed to be amended, and briefly expresses the general subject embraced in such sections, if they have a common connection with the general subject, it is sufficient notice to the public to lead it to an inquiry into the body of the Act to ascertain what changes are proposed in the existing law, and anything germane to the subject expressed in the title may be included in the Act. We think, therefore, that the objections to the title of Senate Bill Five are fully answered by this Court in the Gunn and Allen case, *supra*.

It is next contended that Senate Bill Five is unconstitutional because its provisions apportioning the second,

third and fourth gas taxes to the several counties of the State were enacted in the alternative.

No constitutional provision is cited which is claimed to be violated by the alternative provisions of Senate Bill Five but appellee rests his contention on the ground that those provisions amount to a delegation of legislative power. Legislative Acts stated in the alternative which attempt to delegate legislative power or which alternatively vest discretionary power in designated officers to enforce, or which contain inconsistent alternatives and for other reasons not necessary to state, might be unconstitutional but that is not the case with the Act under consideration. The alternative provisions in Senate Bill Five relate only to the distribution of the proceeds of the tax collector, the said tax being imposed by the Act in definite and unconditional terms. If the primary distribution of the tax is constitutional all the alternatives become ineffective but if the primary distribution is unconstitutional the Act mandatorially requires that it be distributed in another manner which is directly and positively stated. The alternative provisions of Senate Bill Five carry no authority whatever for the exercise of discretion on the part of, or the delegation of legislative power to anyone. The courts in this country have repeatedly upheld such provisions. In Munn v. Finger, 66 Fla. 572, 64 So. R. 271, and City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. R. 769, this Court upheld the validity of Acts of the legislature on reasoning similar to that here presented. The following cases are also in point: Hill v. Wallace, 259 U. S. 44, 42 Sup. Ct. R. 453; State ex rel. Buford v. Watkins, 88 Fla. 392, 102 So. R. 347, Ex parte Schuler, 167 Cal. 282, 139 Pac. R. 685, Ann. Cas. 1915 C. 706; Snetzer v. Gregg, 129 Ark. 542, 196 So. W. R. 925, L. R. A. 1917 F. 999; State ex rel. Davis-Smith Company v. Clausen, 65 Wash. 156, 117

Pac. R. 1101, 37 L. R. A. (N. S.) 466; State ex rel. v. Howat, 107 Kan. 423, 191 Pac. R. 585; People v. Sterling Refining Company, 86 Cal. App. 558, 261 Pac. R. 1080; Saari v. Gleason, 126 Minn. 378, 148 N. W. R. 293; Equitable Guarantee and Trust v. Donahoe, 3 Pennewill 191 (Del.), 49 Atl. R. 372, State v. Duncan, 265 Mo. 26, 175 So. W. R. 940.

It is next contended that Senate Bills One and Five are violative of Section Eleven of Article Sixteen of the Constitution, which is as follows.

No extra compensation shall be made to any officer, agent, employee, or contractor after the services shall have been rendered, or the contract made; nor shall any money be appropriated or paid on any claim, the subject matter of which shall not have been provided for by pre-existing laws, unless such compensation or claim be allowed by bill passed by two-thirds of the members elected to each house of the Legislature.

This contention is bottomed on the assumption that the distribution of the second and third gas taxes among the counties of the State for road indebtedness as provided in Senate Bill Five is tantamount to an undertaking on the part of the State to assume and pay a moral obligation to the counties and that if such assumption is true the Act must be approved by two-thirds of the members elected to each house of the legislature.

An examination of Section Eleven of Article Sixteen discloses that it applies only to two classes of claims against the State, viz: (1) Extra compensation to officers, agents, employes, or contractors after the service rendered or the contract made, and (2) Claims against the State, the subject matter or basis for which were not provided for or authorized by pre-existing law. As to either or both such

claims they can be paid only by an appropriation approved by two-thirds of the members elected to each house of the legislature. Both these classes of claims are personal, the first for extra compensation on an authorized contract and the second for compensation on an unauthorized contract. In the case at bar there is no claim of any kind against the State involved. The last quoted provision of the Constitution has no application whatever.

It is next contended that by the inclusion of the Governor, Comptroller, and State Treasurer on the State Board of Administration as provided in Senate Bill Five they are required "to perform the functions of more than one office under the government of the State at the same time" contrary to Section Fifteen of Article Sixteen of the Constitution.

Senate Bill One provides for the organization of a State Board of Administration to be composed of the Governor, Comptroller, and State Treasurer, and as members of such board imposes on them certain powers and duties. In this situation the question raised must turn on the proposition of whether or not the powers and duties imposed on the Governor, Comptroller, and State Treasurer as members of the State Board of Administration are such as to constitute them the holders of or performing the functions of more than one office under the government of the State at the same time as contemplated by the pertinent part of Section Fifteen of Article Sixteen of the Constitution as above quoted.

The term "office" implies a delegation of a portion of the sovereign power to, and the possession of it by the person filling the office. State ex rel. Clyatt v. Hocker, 39 Fla. 477, 22 So. R. 721; State ex rel. Holloway v. Sheats, 78 Fla. 583, 83 So. R. 508. The "functions" of an office as employed in Section Fifteen of Article Sixteen of the

Constitution has reference to the powers and duties vested in the office by the authority creating it. State ex rel. Yancy v. Hyde, 121 Ind. 20, 22 N. E. R. 644. State and county offices may be created and their duties defined by the Constitution or by statute and the legislature may also impose additional powers and duties on both constitutional and statutory officers so long as such duties are not inconsistent with their duties imposed by the Constitution.

In Whitaker v. Parsons, 80 Fla. 352, 86 So. R. 247, this Court held that it was competent for the legislature to impose additional duties on the administrative officers of the executive department not inconsistent with their duties as defined in the Constitution, such duties being to serve on boards or commissions in conjunction with other officers who are provided for by statute, their commissions issued to them as constitutional officers being sufficient to cover any duties imposed upon them by law. The fact of imposing additional duties by statute on both State and County constitutional officers seems to have become securely imbedded in our governmental scheme and has from time to time received the *imprimatur* of this Court, Whitaker v. Parsons, *supra*, which we think fully answers this phase of the case. See also Lainhart v. Catts, 73 Fla. 735, 75 So. R. 47; Hardee v. State ex rel. Gaines, 83 Fla. 544, 91 So. R. 909. The Trustees of the Internal Improvement Fund, Board of Commissioners of Everglades Drainage District, Okeechobee Flood Control District, the Railroad Assessment Board, the Pension Board, Insurance Commissioner, the "Blue Sky" Board, State Livestock Sanitary Board as first created and others are common instances in which administrative boards have been composed of one or more constitutional State officers and been vested with additional governmental functions.

Sections Twelve, Thirteen, Fourteen, Fifteen, and Sixteen of Senate Bill One provide for the organization of and define the powers and duties of the State Board of Administration. Inspection of these sections discloses that the State Board of Administration is the mere fiscal agent of the counties together with certain road and bridge districts in this State for the economic, safe keeping, and distribution of road and bridge funds that come into their hands by virtue of the terms of Senate Bills One and Five. Each member of the State Board of Adminstration is required to give bond for the forthcoming of any funds that come into their hands and the State Treasurer is made a county treasurer ex officio for the several counties of the State. Such duties are nothing more than additional duties imposed on the Governor, Comptroller, and the State Treasurer and are in no wise inconsistent with their constitutional duties as such or their duties as administrative officers of the executive department.

The contention that Senate Bill One makes the State Treasurer county treasurer ex officio of each county of the State contrary to the provision of the Constitution under consideration is completely answered by Section Six of Article Eight of the Constitution as amended in 1914. Section Six of Article Eight directs that "the legislature shall provide by law for the care and custody of all county funds." In providing for the "care and custody of all county funds" the discretion of the legislature is unrestricted, and so long as a sensible, reasonable, workable plan is devised it should be upheld. The legislature may provide, and has, in fact provided for keeping certain county funds in one way and other county funds in another way, there being no constitutional limitation laid on it in respect to the custody of either county or road district funds. It was not necessary to the validity of the Act to

designate the State Treasurer as county treasurer ex officio, the "care and custody of all county funds" might have been committed to him by official title. On the adoption of Section Six of Article Eight of the Constitution as amended in 1914 the provisions of Sections Four and Seventeen of Article Sixteen in so far as they apply to the office of county treasurer became obsolete and the power of the legislature in the premises became absolute. The reason and policy of the Act though obvious are no concern of the Court. We may assume that it was actuated by a stern necessity.

It is next contended that Senate Bill One is violative of Section One of Article Three of the Constitution in that it delegates legislative power to the State Board of Administration and that it is violative of Section Twenty-seven of Article Three of the Constitution in that it creates new offices and provides for filling them in an unconstitutional manner.

In response to the contention that Senate Bill One creates new offices and provides for filling them in an unconstitutional manner, it is sufficient to say that this contention is fully answered in the negative by our treatment and disposition of the question immediately preceding this one. To determine the contention that Senate Bill One delegates legislative power to the State Board of Administration contrary to Section One of Article Three of the Constitution it becomes necessary for us to examine these provisions of Senate Bill One defining the powers of the State Board of Administration. In fine, the Act directs the board to make an estimate each year of all moneys available to each county and special road and bridge district for the ensuing fiscal year, it is also directed to anticipate and appropriate certain funds in the Act designated to the principal, interest, and sinking fund of

the bonds of said counties and the Comptroller is required
to notify the proper county officers of the amounts so
found to be available for interest, sinking fund, and prin-
cipal requirements. If the amount is sufficient to meet all
principal, interest, and sinking fund requirements the
county commissioners are directed to make no *ad valorem*
tax levy for that year but if found to be insufficient the
county commissioners are required to levy an *ad valorem*
tax sufficient to meet the deficit. It is also provided that
all banks selected for depositories by the State Treasurer
as county treasurer ex officio shall be approved by the
State Board of Administration and that county commis-
sioners may issue refunding bonds on approval of the said
board. The State Board of Administration in other words
is clothed with nothing but administrative duties, the
county commissioners have full power to fix the rate and
make the levy of all *ad valorem* taxes, to issue refunding
bonds, and administer the general affairs of the counties
and special road and bridge districts. None of these
duties are legislative. This reasoning is amply supported
by State v. Allen, 83 Fla. 214, 91 So. R. 104, which we
think conclude the question contrary to the contention of
appellee. State v. Jacksonville Terminal Company, 90
Fla. 721, 106 So. R. 576; Bailey v. Van Pelt, 78 Fla. 337,
363, 82 So. R. 789; State v. Duval County, 76 Fla. 180, 79
So. R. 692; Ex parte Taylor, 68 Fla. 61, 66 So. R. 292;
State v. Holmes, 53 Fla. 226, 44 So. R. 179; State v. Bryan,
50 Fla. 293, 39 So. R. 929.

It is next contended that Senate Bills One and Five im-
pair the right of local self-government.

This is a cryptic contention. There is no attempt to
define the scope of local self-government as so used or
to state to what extent or in what manner the right there-
in is impaired. It is alleged that Senate Bills One and

Five transfer the powers and duties of county officers from the various counties to a central board at Tallahassee contrary to the letter and spirit of the Constitution. In our argument on the preceding question we demonstrated that there was no constitutional inhibition against withdrawing from or enlarging the powers and duties of constitutional State or county officers so long as their duties as defined by the Constitution are not interferred with. The following cases also support this view: State ex rel. Buford v. Fearnside, 87 Fla. 349, 100 So. R. 256; State ex rel. Buford v. Daniel, 87 Fla. 270, 99 So. R. 804; State v. Walton County, 93 Fla. 796, 112 So. R. 630.

The principle of local self-government means that local affairs shall be decided upon and regulated by local authorities, and that the citizens of particular districts have the right to determine their own public concerns and select their own local officials without being controlled by the general public or by the State at large. Black Constitutional Law, 373, 374. Local self-government as we know it is an Anglo Saxon creation and had its beginnings in the early civil divisions of England called counties, hundreds, tithings and towns, they being the predecessors of the several divisions of our state and date back to the time of Alfred. Our strength as a self-governing people may be attributable to the distribution of governmental powers among the local political subdivisions of the State and the exercise of these powers by the people of the locality. Rathbone v. Worth, 40 N. Y. Supp. 535, 542, 6 App. Div. 277. Many of the early decisions regarded the principle of local self-government as fundamental in our institutions and as a matter of constitutional right, whether in terms expressly provided for or not. Rathbone v. Worth, *supra*. People v. Hurlbut, 24 Mich. 44. The courts of Michigan, Indiana, Kentucky and other states with con-

stitutional provisions protecting the right of local self-government support this view. An extensive examination of the question reveals, however, that in the absence of special constitutional provisions supporting it, the great weight of authority denies in toto any inherent right of local self-government which is beyond legislative control. Dillon Municipal Corporations (Fifth Ed.) Vol. 1, 154 and cases cited. Reason and justice support the modern rule. Local self-government in England, the Colonies, the North West Territory, and in other territorial acquisitions contiguous to our main country was necessitated by isolation and physical barriers. The growth and dissemination of population has dispelled the isolation and the railroad, the good road, the telephone, telegraph, aeroplane, and the radio have dissolved physical barriers. What were "local affairs" yesterday to be regulated by local authority have today become the affair of the State and that which was yesterday the "concern" of the community has today become the interest of the nation. When, therefore, the "affairs" of the locality merge into and become in whole or in part the affairs of the State of the nation they become subject to regulation by congress or the Legislature. The Constitution of this State having no express provision with reference to the principle of "local self-government" this Court is in harmony with the decided weight of authority in holding that it is not operative to nullify a legislative enactment that does not violate any express or implied provision of the State or Federal Constitution. State v. Johns, 92 Fla. 187, 109 So. R. 228. The literal import of our Constitution is to the same effect. Section One of Article Eight provides that the State shall be divided into political divisions to be called counties. County officers are enumerated in the Constitution but with the exception of county judge their powers and duties

are all prescribed by law, new counties are created by law, subdivisions of the county except commissioners districts are defined by statute and cities and towns derive their existence and perform all their functions by legislative enactment. Section Eight of Article Eight of the Constitution. The facts are that there is now hardly any element of what we term local self-government that is not subject to congressional or State legislative regulation or both. No principle of the law is more subject to change or modification. Any attempt, therefore, to fasten on it a fixed status or to set it apart as something that cannot be dealt with even by the power that created it is "sound and fury signifying nothing."

It is also urged in this connection that Senate Bills One and Five are in conflict with the spirit of the Constitution. No two critics would agree on just what the attribute or quality of the Constitution is and the briefs of counsel give us no light on the subject. Someone referred to it as "that convenient refuge of loose thinking which is vaguely called the spirit of the Constitution." It is enough to say here that this phase of the question is conclusively answered by this Court in a complete refutation of the idea that the spirit of the Constitution may supply the test of the validity of a legislative enactment. State v. Johns, 92 Fla. 187, 109 So. R. 228; Wooten v. State, 24 Fla. 335 text 345, 5 So. R. 39.

It is next contended that those provisions of Senate Bills One and Five which attempt to levy a tax and distribute the proceeds thereof to counties and road districts for the purpose of paying the principal and interest of their bonded indebtedness for roads violates Section Six of Article Nine of the Constitution relating to the issue of State bonds which is as follows:

"The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, or for the purpose of redeeming or refunding bonds already issued, at a lower rate of interest."

This language is clear and unambiguous. It prohibits the issuing of State bonds except for repelling invasion, suppressing insurrection or for refunding bonds already issued at a lower rate of interest. We think a State bond as here used must have reference to a contractual obligation to pay money or something of value. Here it is insisted that the distribution of the proceeds of the tax levied by Senate Bill Five to the counties and special road and bridge districts with the direction to apply such proceeds to the principal and interest of their bonds should be construed as such a contractual obligation on the part of the State, although said bonds are not, never have been, and under the terms of the Act never can be State bonds or State obligations of any kind. To support this contention appellee relies on Cheney v. Jones, 14 Fla. 587; Martin v. Dade Muck Land Company, 95 Fla. 530, 116 So. R. 449; and Advisory Opinon to the Governor, 94 Fla. 967, 114 So. R. 850.

In Cheney v. Jones this Court construed certain provisions of Article Twelve of the Constitution of 1868 which authorized the Legislature to provide for raising revenue sufficient to defray the expenses of the State for each fiscal year and to "issue State bonds bearing interest, for securing the debt." The Legislature of 1871 and 1873 authorized a bond issue for the purpose of meeting appropriations which it had made and intended to make in the future but for which no indebtedness existed at the time of the passage of the Act. This Court held that such bonds could not be issued nor could a tax be levied to pay them.

The Constitutional provisions construed and applied and the facts supporting Cheney v. Jones are not in point with and do not support the instant case.

In Advisory Opinion to the Governor·this Court construed Chapter 12297, Acts of 1927, authorizing the State Road Department to borrow money and execute its notes therefor to meet obligations incurred in executing its budget of maintenance and construction for the current year. We held that the State Road Department was a State agent, exercising a part of the sovereign power of the State and that any debt incurred by it pursuant to lawful authority is a State obligation forbidden by Section Six of Article Nine of the Constitution.

In Martin v. Dade Muck Land Company this Court had under consideration Chapter 12016, Acts of 1927, which provides for the issuance of twenty million dollars of bonds of the Everglades Drainage District. The Act obligated the State to pay the bonds and provided for State funds to pay them in the event the drainage district failed to do so, they were obligations of the drainage district without any finding that they were beneficial to the State, though under the terms of the Act the bonds constituted a contract with the holder enforceable ultimately against the State. Chapter 12016, Acts of 1927, was apparently designed to impose an obligation on the State for the benefit of the Everglades Drainage District and with State credit to secure the purchasers of bonds sold under it. The rules promulgated by the governing board of the district (Chapter 12017, Acts of 1927) also required the bonds to recite that the *ad valorem* taxes levied against the district would be paid from the funds of the district or from funds appropriated by the State for that purpose. Such affirmative declarations as these imposing a bonded obligation on the State not for the purpose of repelling invasion or fund-

ing bonds already issued were in the teeth of Section Six of Article Nine of the Constitution and were properly held to be so.

In the case at bar we are confronted with no such an array of facts. Neither of the statutes under attack imposes an obligation on the State by contract or otherwise, no debt is created or assumed, no consideration of any kind passes to the State, the State borrows nothing nor does it receive anything, it makes no promise of any kind, it pledges nothing, and the body of the Act in as clear terms as is possible for language to express, negatives any intent or purpose on the part of the State to assume or become responsible directly or indirectly for county, district, or other obligations, Sections Eight and Twenty of Senate Bill One being as follows:

"Section 8. It is hereby declared that all bonds heretofore issued by any county or special road and bridge district, and outstanding at the time of the passage of this Act, and issued for the purpose of obtaining funds to pay for the construction of roads or roads and bridges, and all refunding bonds which have been issued by any county or special road and bridge district for the purpose of constructing roads or roads and bridges, shall remain obligations of said counties or special road and bridge districts respectively, and each of said counties or districts shall be legally liable for the full amount of its bonds so issued by it outstanding, together with interest thereon until paid.

"Section 20. It is hereby expressly declared that it is not the purpose or intention of this Act or any part hereof to obligate the State of Florida, directly or indirectly or contingently, for the payment of the obligations of any counties or the obligations of any

special road and bridge district thereof; and this Act
is not to be construed as obligating the State of Flor-
ida to the holders of said bonds to make any payment
of the same, nor shall holders have any right to en-
force the appropriation of the moneys hereinabove
provided for. It is further declared that appropria-
tions are made specifically for the benefit of the tax-
payers and property owners of the State of Florida
and for the purpose of rendering assistance to the
various State agencies which have already performed
part of the functions resting upon the State, and this
Act shall be subject to amendment, alteration, or re-
peal at any time."

At best, all that can be said of Senate Bills One and Five
is that they impose an excise tax on the sale of gasoline
and other like products of petroleum, uniform throughout
the State and distribute a portion of the proceeds to the
counties and road districts for road and bridge purposes,
the Act requiring that said proceeds be used by the coun-
ties and road districts in retirement of their outstanding
road bonds. The State does not undertake to pay or be-
come responsible for those bonds. It does not undertake
to apply the proceeds distributed to the payment of the
bonds and in fact this designation that the proceeds of the
tax to the payment of county road and district bonds is
the only respect in which it is different from other Acts
that have been frequently passed by the Legislature dis-
tributing the proceeds of tax funds collected by the State
to the counties. For concrete cases in which this has been
done see the following: Section 966, Rev. Gen. Stats.;
Section 1238, Comp. Gen. Laws 1927; Chapter 6421, Acts
of 1913; Section 889, Rev. Gen. Stats.; Section 1145,
Comp. Gen. Laws 1927; Chapter 6421, Acts of 1913, and
Chapter 8556, Acts of 1921; Section 1627, Rev. Gen. Stats.,

2477 Comp. Gen. Laws; Section 1790, Rev. Gen. Stats;
Section 2841, Comp. Gen. Laws; Chapter 7328, Acts of
1917; Chapter 8553, Acts of 1921; Chapter 9120, Acts of
1923; Chapter 10025, Acts of 1925; Section 438-439, Gen-
Stats. of 1906, and Section 803 et seq., Rev. Gen Stats;
Section 1050 et seq., Comp. Gen. Laws 1927. The whole
theory of the Acts is to relieve counties and road districts
which had undertaken to perform a duty resting on the
State to provide roads and bridges and which the legisla-
ture declared in Section One of Senate Bill One had con-
tributed substantially to the general welfare, settlement,
and development of the State, the relief so provided being
subject to alteration or repeal at any time. It is quite as
important for the State to conserve the financial integrity
of its various subdivisions as it is to conserve its own and
within constitutional restrictions the legislature may exer-
cise its taxing power to do so.

It is admitted that the building of good roads is a State
function for which the State may exercise its taxing power.
If this is true there is certainly no sound reason why they
should not be constructed or their construction aided by
counties or other State agencies. At any rate this is what
has actually been done because every road constructed by
the counties or special road and bridge districts has been
constructed by State authorization. It has been an oft
repeated practice for the Legislature to apportion the pro-
ceeds of taxes collected back to the counties. We have
searched diligently and have found no organic legal re-
straint on the practice and can conceive of no good reason
why it should not be done or why it is not competent for
the Legislature to direct the manner of its use when appor-
tioned.

In this holding we do not in the least recede from the
rule approved by this Court, so well and tersely stated by

Mr. Justice ELLIS in Advisory Opinion to the Governor, 94 Fla. 967, 114 So. R. 850, that the wholesome restraints of Section Six of Article Nine must not be defeated by a narrow or technical construction. We think, however, that the provision must be given liberal interpretation and should not be extended to conditions not expressed in the terms of the Act or which cannot be inferred from any reasonable deduction therefrom. We would in effect do this if we extended a mere inhibition to issue State bonds for specified purposes to prohibit the legislature from distributing the proceeds of excise taxes imposed by Senate Bill Five to aid counties in the discharge of obligations undertaken for the benefit of the State pursuant to legislative authority. If the makers of the Constitution had desired to do so it would have been an easy matter to have extended the terms of the Constitution to cover situations like that under review.

Our State Constitution is not an enabling Act, neither is it a grant of enumerated powers to the Legislature. It is a restraining act and such acts as it does not in express terms withdraw from and prohibit the Legislature from doing, it (the Legislature) is at liberty to do or authorize to be done in a lawful manner.

We have purposely not involved our discussion of Section Six of Article Nine with the alleged violation of Section Two of Article Nine, relating to the power of the Legislature to raise revenue sufficient to defray the expenses of the State. We do not see that the subject matter of Section Two and Six of Article Nine are interrelated and it is not made to appear that a discussion of Section Two has any relation to this treatment unless the statutes brought in question impose an unconstitutional obligation on the State, then, in that event such obligation would not be an expense of the State.

It is next contended that Senate Bills One and Five are violative of Section Two of Article Nine of the Constitution, which is as follows:

"The Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State."

Appellee urges that under this provision of the Constitution the Legislature can levy taxes only for the purpose of defraying the expenses of the State, that Senate Bill Five attempts to distribute a portion of the gas tax levied therein to the counties and road districts to apply on their road bonds, that such a distribution is not an expense of the State and is in consequence thereof invalid. In support of this contention appellee relies on Cheney v. Jones, 14 Fla. 587; Barrow v. Moffett, 95 Fla. 111, 116 So. R. 71; and Advisory Opinion to the Governor, 94 Fla. 967, 114 So. R. 850.

We do not think that Barrow v. Moffett has any application whatever to the case at bar. In that case this Court had under consideration a decree of the lower court validating a bond issue of the Board of Public Instruction of Highlands County pursuant to Chapter 12844, Acts of 1927, the purpose of said bonds being to raise funds to pay the floating indebtedness of said county incurred in supporting its public free schools. The Act and the bond issue were held invalid because of conflict with Sections Eight and Nine of Article Twelve of the Constitution. There was no question about the legality of the debt that the bonds were issued to pay. That was admitted. The effect of the decision was to hold that bonds could not be issued to pay a past due indebtedness from the sources pro-

vided. We do not see that it furnishes any guide to an interpretation of the question here raised.

In Advisory Opinion to the Governor, November 23, 1927, we held that Chapter 12297, Acts of 1927, authorizing the State Road Department to borrow money against its anticipated revenues and execute its notes therefor was violative of Section Six of Article Nine of the Constitution. Such an obligation having been held void it necessarily follows that the payment of it is not an expense of the State that taxes may be imposed to pay as contemplated by Section Two of Article Nine of the Constitution.

In addition to what we said about Cheney v. Jones in treating the question immediately preceding this, that case also holds that Section Two of Article Twelve of the Constitution of 1868, Section Two of Article Nine of the Constitution of 1885, is a limitation on the power of the Legislature to raise revenue, which can only be done to defray the expenses of the State. This interpretation of Section Two of Article Nine was followed in the Advisory Opinion to the Governor November 23, 1929, but neither of these cases attempted to define the phrase "expenses of the State," or to suggest that such a distribution to the counties and road districts as is now under attack cannot be classed as such an expense.

It would be folly for us to undertake to enumerate any arbitrary list of expenditures and decree them to answer the question, what are "expenses of the State." In Cheney v. Jones this Court held that "expenses of the State" includes such expenditures as may be authorized by the Legislature and which are not prohibited by the Constitution. It was also held that this provision was so broad that there could be no necessity to travel outside its terms for the legitimate exercise of all the powers of government. We think it may easily be construed to cover any expen-

diture for a public purpose not prohibited by the Constitution. We also held in Cheney v. Jones that it has been established on high judicial authority that as to the State governments there is no limitation upon the power of the Legislature as to the amount or objects of taxation; that the interest, wisdom, and justice of the legislative body, and its relation with its constituents, furnish the only security against unjust and excessive taxation, unless there be express restrictions upon that power in the Constitution.

Appellee predicates this contention in part on the theory that the apportionment to the counties now under consideration is invalid because not for a ''State purpose.'' In Section Five of Article Nine it is provided that the Legislature shall authorize the counties and municipalities to assess taxes for county and municipal purposes and for no other purpose. On account of litigation arising from this provision the phrase ''county purpose'' has come to have a well defined meaning but there is no similar language in the Constitution from which the term ''State purpose'' can be coined nor in reason can there be, because of the wide range that any limitation placed on a tax for State purposes must take over that for a county purpose. There can be no objection to the use of the term ''State purpose'' but it can have no such restriction on the taxing power as that implied by a ''county purpose.'' In the scope of their application there is nothing analogous between a ''State purpose'' or ''expenses of the State'' and a ''county purpose'' by which they can be compared. They are not convertible terms. If ''expenses of the State'' includes such expenditures as may be authorized by the Legislature and which are not prohibited by the Constitution, it must necessarily follow that what are ''expenses of the State'' is a matter for legislative determination.

This Court has repeatedly held that a legislative determination as to what constitutes a county purpose is entitled to such weight as to require allegation and proof, showing that contrary to justify the courts in overthrowing the legislative judgment. Jackson Lumber Company v. Walton County, 95 Fla. 632, 116 So. R. 771; Jordan v. Duval County, 68 Fla. 48, 66 So. R. 298, and many others. There can be no good reason why this rule should not apply to a legislative judgment as to what constitutes an "expense of the State," or an expenditure for a State purpose.

The law is well settled that the control of all public highways is vested in the State absolutely without any constitutional limitations or restrictions, that the duty of constructing and maintaining highways is an obligation and function of the State, that the actual construction of highways may be delegated by the Legislature to counties and road districts as agents of the State, but even when this is done and the roads paid for by the counties the State may at any time assert its control and withdraw the management of the roads in any county from the county commissioners and vest such control in the State Highway Department or any other body or board it may see fit. State ex rel. Buford v. Fearnside, 87 Fla. 349, 100 So. R. 256; State ex rel. Luning v. Johnson, 71 Fla. 363, 72 So. R. 477; Keggan v. Hillsborough County, 71 Fla. 356, 71 So. R. 372. The proprietary right in public roads is in the State regardless of whether constructed by the State or local agencies representing the State. The power of the legislature over public roads is complete, it may construct and manage them directly or through local agencies, it may require every able bodied citizen to work them, it may regulate traffic over them, and it has repeatedly aided them by the taxing power of the State. Lewis v. Leon County, 91 Fla. 118, 107 So. R. 146; Jack-

son Lumber Company v. Walton County, 95 Fla. 632, 116 So. R. 771; County Commissioners of Duval County v. City of Jacksonville, 36 Fla. 196, 18 So. R. 339; Atkins v. Kansas, 191 U. S. 207, 222, 24 Sup. Ct. R. 124; Stewart v. DeLand-Lake Helen Special Road and Bridge District in Volusia County, 71 Fla. 158, 71 So. R. 42; State v. Allen, 83 Fla. 214, 91 So. R. 104; Butler v. Perry, 67 Fla. 405, 66 So. R. 150; Butler v. Sheriff of Columbia County, Florida, 240 U. S. 328, 36 Sup. Ct. R. 258; 1 Elliott on Roads and Streets (4th Ed.) Section 509, 4 Elliott on Roads and Streets (4th Ed.) Section 511.

From the foregoing it must follow that a public highway is essentially a State instrumentality, that counties and road districts as corporate entities have a mere qualified proprietary right in them even though constructed by them with local taxes, that the Legislature may at any time authorize the construction of roads by counties or road districts, and that they are subject at all times to legislative control.

Section Three of Article Nine of the Constitution commands that no tax shall be levied except in pursuant of law. We construe this provision to mean that all taxes must be imposed by organic law or by a valid statute. Section Five of Article Nine recognizes three distinct classes of taxes, an *ad valorem* tax, a capitation tax and a tax on licenses. It is required that the capitation tax be applied exclusively to common school purposes but there is no restriction or limitation whatever on the application of the license tax. The matter of levying a license tax is an inherent legislative power and being inherent in the Legislature it necessarily follows that it may be levied for a county purpose or a State purpose. It may be levied and collected by the State and distributed among the counties as the Legislature may deem advisable or the

State may levy it for State purposes and authorize the counties to levy it for county purposes, both methods having been practiced during our constitutional history.

A State excise tax must be imposed on a uniform basis throughout the State but a county excise tax may be imposed uniformly in all the counties, or it may be imposed in only a portion of the counties and omitted in others. The power of the State to impose a State license tax and a county license tax on the same subject to be collected at the same time and by the same officers is settled beyond question in this State. State ex rel. Bonsteel v. Allen, 83 Fla. 214, 91 So. R. 104; State ex rel. Luning v. Johnson, 71 Fla. 363, 72 So. R. 477; Osborne v. State, 33 Fla. 162, 14 So. R. 588.

In Amos v. Gunn, 84 Fla. 285, 94 So. R. 615, this Court held that the tax imposed by Chapter 8411, Acts of 1921, being identical with the tax under consideration was a license tax, that it was within the inherent power of the legislature to impose it, and that there was no constitutional limitation on its imposition so long as due process, equal protection, contract rights, and regulations as to interstate commerce were observed, and Federal power not interfered with. Hardee v. Brown, 56 Fla. 377, 47 So. R. 834; Harper v. Galloway, 58 Fla. 255, 51 So. R. 226. This rule was also approved in Hiers v. Mitchell, 95 Fla. 345, 116 So. R. 81, where, in a strong opinion rendered by Mr. Justice BUFORD, this Court held that a license fee is not a tax within the meaning of the provisions of the organic law requiring uniformity of rates and just valuations of property for purposes of taxation. Jackson v. Neff, 64 Fla. 326, 60 So. R. 350; Ex parte Schuler, 167 Cal. 282, 139 Pac. R. 685, Ann. Cas. 1915, C. 706; Mark v. District of Columbia, 37 App. Cas. (D. C.) 563, 37 L. R. A. (N. S.) 440.

In this holding there is nothing inconsistent with the decision in Cheney v. Jones, *supra*. In that case we were confronted by an Act of the Legislature imposing an *ad valorem* tax on real and personal property to retire matured and anticipated indebtedness of the State, while in the instant case we are considering two Acts providing for the levy, collection, and distribution of an excise tax imposed pursuant to Section Five of Article Nine of the Constitution. In the imposition and in the enforcement of an *ad valorem* and an excise tax there is little in common. As to the *ad valorem* tax uniformity and equality of rate and just valuation are mandatory, while a different rule applies as to an excise.

The policy and expediency of an excise tax is always a question for legislative determination. The objects on which it is imposed, the amount of the tax, and the standard employed to measure the tax are matters in which the legislative discretion may take a broad range. The judiciary is not authorized to revise the judgment of the legislature on those matters unless it is shown to be unequal, grossly oppressive, or offends against every impulse of common right and justice. Connecticut Insurance Company v. Commonwealth, 133 Mass. 161, 163. An excise tax imposed by the counties as provided in Section Five of Article Nine of the Constitution would undoubtedly have to be used for county purposes but in this case the taxes are levied by statute and collected by officers of the State, and since there is no express or implied inhibition in the Constitution to levying and collecting them in this way or to their distribution as the Legislature may deem advisable it does not appear that they were not imposed for a legal purpose. The question of distribution of these taxes we reserve for separate discussion. We think, therefore, that the distribution to the counties of the proceeds of the

taxes as imposed by Senate Bill Five was within the power of the Legislature.

It is next contended that Senate Bills One and Five not only impose unconstitutional and invalid taxes but that the distribution of the taxes thereunder is invalid.

That part of Senate Bill Five imposing the tax brought in question and providing for its distribution is as follows:

"Section 1. Every dealer in gasoline or any other like product of petroleum, under whatever name designated, in this State shall pay a license tax of five dollars to the State and in addition thereto a tax, herein termed gas tax, of five cents per gallon for every gallon of gasoline, or other like products of petroleum sold by him and upon which the tax herein provided has not been paid, or the payment whereof has not been assumed by a person preceding him in the handling of said lot of products, said tax of five cents per gallon being made up of four separate taxes, being:

"First Gas Tax: A tax of two cents per gallon for the State of Florida, for the use of the State Road Department, as provided by law.

"Second Gas Tax: A tax of one cent per gallon to be apportioned to the several counties of the State in the proportion collected in such counties respectively.

"Third Gas Tax: A tax of one cent per gallon to be apportioned to each county in the State in the proportion that the indebtedness authorized, issued and outstanding in the county for road purposes or for road and bridge purposes by the county and/or by any special road and bridge district or districts therein on April 1, 1929, bore to indebtedness of the same class of all counties and/or special road and bridge districts of the State of Florida.

"Fourth Gas Tax: A tax of one cent per gallon to be apportioned equally among the several counties of the State.

"If the foregoing apportionment of either the second or the third gas tax shall be held unconstitutional or ineffective for any reason, then the apportionment thereof shall *ipso facto* be the apportionment herein provided for the other of said two taxes.

"The second and third gas tax apportioned to each of the several counties as above provided shall be applied to the payment of interest and principal and/or sinking funds of indebtedness for road and bridge construction bears to the total amount of such indebtedness issued and now outstanding in all the counties heretofore contracted by each such county respectively and by the special road and bridge districts in such county and/or the construction and maintenance of roads and bridges in such county.

"If the foregoing purposes of application of either the second or third gas tax shall be held unconstitutional or ineffective for any reason, such tax shall be paid into the general revenue funds of the counties to which the tax is apportioned, respectively. Two-thirds of the fourth gas tax after apportionment to each of the several counties shall be used for school purposes and one-third thereof for the construction of roads and bridges in the county to which it is apportioned; provided, however, if the county board of public instruction should find that any part of the amount so allotted to school purposes is unnecessary for an eight months' term, such part shall be paid by the county board of public instruction to the board of county commissioners and shall be used for road construction and maintenance. If the apportionment of this fourth gas tax for such purposes or either of them

shall be held unconstitutional then such apportionment shall be made in such manner as may be lawful.''

The ''First Gas Tax'' is not under attack and is not, therefore, before us. The ''Second Gas Tax'' and the ''Third Gas Tax'' are apportioned to the counties on a different ratio but for a like purpose so they will be treated together. The ''Fourth Gas Tax'' will be reserved for treatment later in this opinion.

The ''Second Gas Tax'' is a tax of one cent per gallon and is apportioned to the several counties of the State in the proportion collected. The ''Third Gas Tax'' is also a tax of one cent per gallon and is apportioned to the several counties of the State in the proportion that the authorized outstanding indebtedness for roads and bridges in said counties, including the indebtedness of special road and bridge districts therein, incurred prior to April 1, 1929, bore to the total of such indebtedness in all the counties and special road and bridge districts in the State. It is also required that after distribution among the counties the second and third gas taxes shall be applied to the payment of principal, interest, and sinking fund of outstanding road and bridge indebtedness of said counties incurred prior to April 1, 1929.

The contention is that such an apportionment is bad because funds collected in one county are used to pay the debts of other and different counties. If the second gas tax or the third gas tax partook of the nature of an *ad valorem* tax there might be substance to this contention but the very nature of the tax overthrows and completely rebuts it. The tax is not attached to an article with a fixed situs, the tax is imposed on a ''sale'' and not on something tangible, the sale on which the tax is based is transitory by nature, the commodity sold may be delivered at the place of purchase or elsewhere within the State, the

residence of the consumer may be domestic or foreign, the commodity is often purchased in one county and consumed in the same or in different counties than that where purchased, in theory it is levied and collected at the place of retail but in practice fifty per cent. of it is actually paid for at points outside the State and the remaining fifty per cent. is paid for from a half dozen points within the State, it is an excise tax pure and simple, springing from a source never dreamed of by the makers of the Constitution and in conjunction with the automobile has made a system of good roads throughout the State indispensable which of necessity cannot be restricted by county lines. Any argument to limit the application of the tax under consideration, which is grounded on constitutional limitations effecting *ad valorem* taxes is beside the issue.

In applying organic rules to such acts as we have here it must be borne in mind, that while constitutional guarantees never vary, the scope of their application must expand or contract to meet the changing conditions of our social and economic order. Of all sciences the law will be the last to become static. It is eternally dynamic, broadening, deepening. It has always and must continually guide the course of development in every field of endeavor. The Constitution was never conceived or intended as a legal clamp and straight-jacket applicable only to the agrarian economic order in which it was evolved. It is on the other hand and instrument of expanding life and its principles must be so applied as to bring within its compass new conditions that constantly develop in the life of our social and economic evolution, otherwise many of the great divisions of the law such as that effecting railroads, telegraphs, telephones, steamships, automobiles, minerals, radios, aeronautics, good roads, and others are impressed with no constitutional guarantees. Euclid v. Ambler

Realty Company, 272 U. S. 365, 47 Sup. Ct. R. 114, 71 L. Ed. 303.

In the absence of constitutional regulation the Legislature has a wide discretion in the distribution and application of the proceeds of a tax. Inequality of assessment is necessarily fatal to the levy but if collected for the public welfare inequality of distribution is not fatal. Cooley on Taxation, Section 1813; Duffy v. Treasurer and Receiver General, 234 Mass. 42, 125 N. E. R. 135; Bayville v. Boothbay Harbor, 110 Me. 46, 85 Atl. R. 300, Ann. Cas. 1914 B. 1135; Etling v. Hickman, 172 Mo. 237, 72 So. W. R. 700; Sanderson v. Texarkana, 103 Ark. 529, 146 So. W. R. 105; Holton v. Board of Commissioners, 93 N. C. 430; City of Lowell v. Oliver, 8 Allen (Mass.) 247; State ex rel. Van Dyke v. Cary, 181 Wis. 564, 191 N. W. R. 546; Fisher Brothers Company v. Brown, 111 Ohio St. 602, 146 N. E. R. 100; Durrett v. Davidson, 122 Ky. 851, 93 So. W. R. 25, 8 L. R. A. (N. S.) 546. We have no constitutional provision regulating the distribution of taxes except for school purposes and we do not think it practicable or contemplated by the Constitution that a public benefit may be shared only by those who bear the burden.

The validity of every tax must be determined upon its own facts and not on the form in which the taxing scheme is cast or manner in which it is clothed. The ultimate controlling test of validity must be revealed by the practical operation and effect of the statute upon existing conditions as applied and enforced. St. Louis Southwestern v. State of Arkansas, 235 U. S. 350, 35 Sup. Ct. R. 99; Kansas City, Ft. S. & M. Company v. Secretary of State of Kansas, 240 U. S. 227, 36 Sup. Ct. R. 261; American Manufacturing Company v. City of St. Louis, 250 U. S. 459, 39 Sup. Ct. R. 522; Wagner v. City of Covington,

251 U. S. 95, 40 Sup. Ct. R. 93; Panhandle Oil v. Mississippi ex rel. Knox, 277 U. S. 218, 48 Sup. Ct. R. 451, 72 L. Ed. 857. With this predicate as a datum point let us examine the practical operation and effect of the distribution of the proceeds of the tax under the Acts assaulted with the view of determining whether or not they produce such unconstitutional results as would render them void.

Section Five of Article Nine of the Constitution in defining a scheme of taxation for the guidance of the legislature, contemplates an *ad valorem* tax on all real and personal property for county and municipal purposes, a capitation tax for common school purposes, and a "tax on licenses." If the tax under consideration was an *ad valorem* tax imposed by the counties under direction of the legislature it would necessarily have to be used in the counties from which collected, but that is not the case. The second and third gas taxes are imposed by the legislature under its inherent power to provide for a "tax on licenses," they are collected by State officers and distributed to the counties for county purposes. Section 4 of Chapter 9120, Acts of .1923, of which Senate Bill Five is amendatory, speaks of the said taxes as county license taxes. There is no constitutional inhibition on the legislature imposing a license tax for county purposes and apportioning such tax among the counties so long as there is no abuse of legislative discretion. Appellee concedes that under Section Two of Article Nine of the Constitution the Legislature may impose a State excise or other tax for road purposes and distribute said tax among the counties of the State as it sees fit. If this is true it must follow that by virtue of Section Five of Article Nine the Legislature may impose an excise tax for county road purposes and distribute it among the counties as it may see fit there being no constitutional limitations as to such distribution in

either case. It is settled by the decisions of this Court that the proceeds of state taxes levied for expenses of the State cannot be used to pay county road bonds but the limitations on the use of such funds as defined in Sections Two and Six of Article Nine of the Constitution have no application to excise taxes imposed by the Legislature and distributed among the counties for county road purposes.

Conditions of life have changed materially since the adoption of our Constitution. Under our social and industrial rearrangement the question of good roads cannot be local. It is no more a county matter than the tariff or currency is a State matter. Its very nature precludes it from being so. A system of good roads is not concerned with county lines. To meet the demand for facilitating the construction of a bigger and better system of roads in this State and to aid the counties in doing this the Legislature in Senate Bill Five has attempted to distribute the proceeds of the taxes raised so as to place the burden of road construction on the object that has made them indispensable and thereby relieve the burden on the home, the farm, the railroad and other properties which if at all, are only incidentally benefited. Senate Bill One expressly declares that the distributions thereunder are made for the benefit of the taxpayers and property owners of the State and for the purpose of rendering assistance to the various State agencies which have already performed part of the functions resting upon the State. The Legislature has in other words come to the realization that as public expenditures increase new sources of revenue must be tapped to meet them and that we cannot continue the old practice of heaping the burden on real estate to do so. To contend that it cannot do this is without support in law or reason. The levy of a tax must be "uniform and equal" but that rule never has, nor can it ever be the

dominant rule to control its distribution. If uniformity and equality were required in the distribution of State, county, or municipal taxes we could never provide a through system of roads, a system of higher education, larger expenditures for bridges at strategic points, institutions for the unfortunate and other such objects as are essential to the common good. In its distribution the public welfare is the pole star that must guide the Legislature and unless the method of distribution adopted can be declared to have no reasonable or legitimate relation to the purpose for which distributed it should be held good.

The mere fact that the method of distributing the proceeds of the tax is arbitrary does not defeat it nor is such a procedure now in this State. It is coeval with the Constitution itself. For more than a generation the taxes on the rolling stock and personal property of railroad companies have been distributed among the counties through which the railroad runs in proportion to the mileage in said counties without regard to its actual situs or physical location. Section 966, Rev. Gen. Stats, Section 1238, Comp. Gen. Laws 1927, Chapter 6421, Acts of 1913. A State license tax is imposed on express companies doing business in Florida. It is payable to the Comptroller and the proceeds distributed among the counties on the basis of assessed valuation. (Section 889, Rev. Gen. Stats., Section 1145, Comp. Gen. Laws 1927, Chapter 6421, Acts of 1913, Chapter 8551, Acts of 1921.) The following Acts also distribute State funds to the counties for various purposes not unlike the distribution in the instant case: Section 1627, Rev. Gen. Stats., Section 2477, Comp. Gen. Laws, Section 1790, Rev. Gen. Stats, Section 2841, Comp. Gen. Laws 1927, Chapter 7328, Acts of 1917, Chapter 8553, Acts of 1921, Chapter 9120, Acts of 1923, and Chapter 10025, Acts of 1925. The Legislature has consistently

levied an excise tax or authorized the counties to do so and has distributed the proceeds thereof in an arbitrary manner. See Sections 438-439 of General Statutes of 1906, Section 803 et seq., Rev. Gen. Stats. of Florida (Section 1050, Comp. Gen. Laws of Florida 1927). The feature of the Act assailed and Acts of like import have been on the statute books for many years unchallenged and millions of dollars have been collected and expended under them, and while this fact is not sufficient to declare them valid if clearly in conflict with paramount law it is strongly persuasive that the Act is not so clearly unconstitutional as it must be shown to be to make it the duty of this Court to set it aside at this time. If, therefore, the validity of an act must be determined by its practical operation and effect there is ample reason on which we may uphold the validity of Senate Bills One and Five.

It is next contended that the apportionment of two-thirds of the Fourth gas tax for school purposes as required by Senate Bill Five is violative of Sections Seven and Nine of Article Twelve of the Constitution.

Section Seven of Article Twelve of the Constitution provides for the apportionment and distribution of the interest on the State school fund and, "all other means provided," to the several counties of the State in proportion to average attendance. Section Nine of the same article defines the county school fund of the several counties in the State and provides for its apportionment and distribution "as may be provided by law." "Provided that such apportionment and distribution shall be made by general law, based upon some declared principle of classification to be determined by the Legislature."

Senate Bill Five requires that the fourth gas tax be distributed equally among the several counties of the State and that two-thirds of said tax be used for school pur-

poses and one-third be used for road and bridge purposes in the county to which distributed; provided that if the county board of public instruction of any county should find that any part of the two-thirds allotted to it for school purposes should not be necessary for an eight months' term then in that event such part shall be turned over by the county board of public instruction to the board of county commissioners to be used for road construction and maintenance.

The Chancellor below held that this distribution of the fourth gas tax was bad, that said tax was a State tax and that one-third of the proceeds thereof should be distributed to the counties equally to be used for roads and bridges, and that the remaining two-thirds should be apportioned to the counties for school purposes as provided by Section Three and One-Half (3½) of Chapter 14573, Acts of 1929.

The primary purpose of Chapter 14573, Acts of 1929, was to raise special revenue for educational purposes. The title clearly does not cover the distribution of revenue for school purposes not embraced or contemplated in the body of the act and is therefore as to such funds in conflict with Section Sixteen of Article Three of the Constitution requiring that the subject matter of every act be briefly expressed in the title. Courts cannot limit or modify the terms of a statute. United States v. Harris, 106 U. S. 629, text 642, 1 Sup. Ct. R. 601; James v. Bowman, 190 U. S. 127, 23 Sup. Ct. R. 678; Yu Cong Eng v. Trinidad, 271 U. S. 500, 46 Sup. Ct. R. 619, 70 L. Ed. 1059; Hill v. Wallace, 259 U. S. 44, 42 Sup. Ct. R. 453. The chancellor was therefore in error in holding that the two-thirds of the fourth gas tax apportioned to the counties for school purposes should be apportioned as provided by Section Three and One-Half (3½) of Chapter 14573, Acts of 1929.

It cannot be questioned that the apportionment of two-thirds of the proceeds of the fourth gas tax to the several counties for school purposes would amount to an appropriation by the Legislature as contemplated by Section Nine of Article Twelve of the Constitution. If this premise is correct, the conclusion is inescapable that the apportionment or distribution of said proceeds among the countries must be "made by general law based upon some declared principle of classification to be determined by the legislature." What is a "declared principle of classification" as used in Section Nine of Article Twelve of the Constitution? It is the grouping of counties on the basis of population, attendance, requirements, convenience, similarity of situation or some other reasonable basis of classification in order that their public requirements or interests will be best served by the apportionment. Classification of counties and municipalities or other governmental entities is generally determined by differences in needs, circumstances, situation, necessity, custom, nature and the like. It cannot be employed as a substerfuge or as a means to evade the plain requirements of the Constitution. It appearing that no general law based on any declared principle of apportionment for the distribution of the proceeds of two-thirds of the fourth gas tax for school purposes to the several counties, was enacted said proceeds as the act requires may be apportioned "in such manner as may be lawful." Commonwealth v. Gilligan, 195 Pa. St. 504, 46 Atl. R. 124; Semple v. Pittsburgh, 212 Pa. 533, 62 Atl. R. 201, page 212.

In practical effect the requirement as to the apportionment of the county school funds as contained in Section Nine of Article Twelve of the Constitution affects nothing but "appropriation by the Legislature," that part of said fund represented by the proportion of the interest on the

state school fund and the one-mill state tax having already been apportioned under Section Seven of Article Twelve, and that part represented by the *ad valorem* tax as required by Section Eight of Article Twelve not being subject to legislative apportionment. Since no general law was enacted for the apportionment of that part of the fourth gas tax appropriated for public free schools, we think that under the terms of Senate Bill Five it may properly be considered as "other means provided" for the support and maintenance of public free schools as defined in Section Seven of Article Twelve of the Constitution and may be apportioned to the counties on the basis of average attendance as therein required.

What has been said in this opinion in regard to the (disposition of) the second gas tax and the third gas tax is applicable to one-third of the fourth gas tax apportioned to the counties for road construction and maintenance.

It follows that the demurrer to the information in the quo warranto suit must be and is hereby sustained and the decree of the Chancellor in the injunction suit as to the apportionment of the "third gas tax" and two-thirds of the "fourth gas tax" and in restraining the application of the "second gas tax" and the "third gas tax" to the payment of district and county road bonds is reversed. In other respects the decree of the Chancellor is affirmed.

WHITFIELD, J., concurs.

WHITFIELD, J.—The Constitution provides for the division of the State into counties, Section 1, Article VIII, and contemplates the existence of "incorporated districts," Section 10, Article IX. The construction of public roads is not regulated by the Constitution, and statutes may make public roads a State purpose or a county purpose or a district purpose, and may authorize and regulate

the issue, not of State bonds, but of county or district bonds for road construction; and may regulate the payment of such county or district road construction bonds by any means not forbidden by organic law. Districts are statutory entities. Instead of taxing the use of the public roads the statute for convenience taxes gasoline which is chiefly used in motor vehicles on the public roads.

There is in the Constitution no specific reference to "State taxes" or to "county taxes"; but the Constitution (1) *requires* the Legislature to provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, Section 2 Article IX; (2) *requires* the Legislature to authorize the several counties to assess and impose taxes for county purposes only, Section 5, Article IX; and (3) provides that the Legislature *may also* provide for levying "a tax on licenses," with no specific limitations, Section 5, Article IX. Amos v. Gunn, 84 Fla. 285, 94 So. R. 615; Hiers v. Mitchell, 95 Fla. 345, 116 So. R. 81.

Statutes may authorize State revenues to be used for road construction as a State expense, Hathaway v. Monroe, 97 Fla. 28, 119 So. R. 149, but Section 6, Article IX, Constitution, in effect forbids the issue of State bonds for road construction, and in order to be effective and to prevent its indirect violation, said Section 6, by intendment likewise forbids the use of *State* revenues to pay *any* bonds issued for road construction. See Martin v. Dade Muck Land Co., 95 Fla. 530, 116 So. R. 449; Advisory Opinion to the Governor, 94 Fla. 967, 114 So. R. 850; State ex rel. v. Green, 95 Fla. 117, 116 So. R. 66.

There are now no State bonds to be redeemed or refunded under Section 6, Article IX of the Constitution. See Chapter 8507, Acts 1921; Section 1379 et seq., and also Vol. 5, page 4761, Comp. Gen. Laws of Florida 1927;

Annual Reports of State Treasurer, J. C. Luning, 1925-27, page 9 et seq.

License taxes may be levied by statute for State expenses or for county or district purposes. The "second gas tax," the "third gas tax" and the "fourth gas tax," provided for by Chapter 14575, Acts of 1929, are not assessed and imposed by the counties; nor are such gas taxes levied for State expenses; but they are license taxes *levied by the statute,* under the license clause of Section 5, Article IX, Constitution, to be collected by State officers as distinct funds, separate and apart from taxes assessed and imposed by counties and from revenues raised for State expenses. The proceeds of such license taxes so levied and collected are to be apportioned to the counties and used for designated county and district purposes, and are wholly distinct from and are not controlled by the organic limitations upon, taxes assessed and imposed by the counties for county purposes under the first clause of Section 5, Article IX.

Such license taxes are not levied by or in the counties as local taxes. They are levied by statute at a uniform rate throughout the State to be collected by State officers as separate statutory funds, the proceeds of the second and third gas taxes to be used for public road purposes in all the counties, the public roads being for the use of the general public without regard to county lines or to the relative burdens of road construction. The legislative power in levying license taxes is not restricted by the Constitution except that the taxes must be levied only in pursuance of law and at a uniform and equal rate; and the taxes must not violate organic property rights or interfere with dominant Federal authority in its sphere. Within these organic limitations *statutes* may levy and apply license taxes for lawful and appropriate public purposes as

the Legislature determines, in the absence of organic limitations or regulations.

County and road district bonds have been issued under statutory authority for road construction, and the statutes require the counties and road districts to levy and collect *ad valorem* taxes to pay such bonds. But this is not the limit of legislative authority. Under the inherent and organic power of the Legislature to provide for levying "a tax on licenses," Chapters 9120, Acts 1923, 10025, Acts 1925, and 12037, Acts 1927, levied license taxes on sales of gasoline for both State and county purposes, the county purposes being to supplement county *ad valorem* tax funds for *road construction*. County and district road bond indebtedness having greatly increased and much road construction having been accomplished, the Legislature, under its sovereign power and under the express authority given by Section 5, Article IX of the Constitution, to provide for levying "a tax on licenses," enacted Chapter 14575, Acts 1929, here considered, amending the prior statutes, and imposing *less* license taxes for road *construction,* but levying two "separate taxes" each of one cent per gallon on sales of gasoline, "to be apportioned among the counties" and used to supplement county and district *ad valorem* tax funds for road *indebtedness,* the levies being made *by statute for county and district* road bond purposes and not for State expenses. A public road in a county may be a county purpose even though it be constructed by means of a district bond issue.

The "second gas tax" and the "third gas tax" not being levied for State expenses, the application of the proceeds thereof to the payment of county and district public road indebtedness is not an evasion of, or an indirect violation of, the intendments of Sections 2 and 6, Article IX, Constitution.

The application of such statutory license taxes to the payment of district road bonds as well as to county road bonds, does not violate the provision of Section 5, Article IX, that the Legislature shall authorize the several counties to assess and impose taxes for county purposes only, because (1) such organic provision is not applicable to license taxes levied by statute throughout the State to be collected by State officers for county and district purposes; (2) if such organic provision is so applicable, the statute may, and in effect does, make public roads constructed by outstanding district bond issues, a county purpose; and (3) statutes may levy license taxes for district as well as county purposes, and the "second gas tax" and the "third gas tax" are levied by statute throughout the State to be collected by State officers and applied to the payment of both county and district road bonds. Public roads in a county being in fact and in law a county purpose, the required payment of district road construction bonds with license taxes levied by statute upon the subject and for the purpose and collected as in this case, does not violate organic property rights of persons who live in or own property in the counties but not in the districts that issued the bonds. Assumption by the districts severally of debts for road construction in the districts respectively, does not make it unlawful to use the proceeds of license taxes levied as in this case by statute for the payment of such debts for public road construction.

The provisions of Chapter 14575 and of Chapter 14486 for the collection and distribution or disbursement by *State officers* of the license taxes levied by the statute throughout the State, for State, county and district purposes, do not violate any provision of the Constitution; but such statutory provisions as to the collection and disbursement by State officers of the license taxes levied by

the statute for county purposes, are expressly authorized by Section 6, Article VIII of the Constitution, as amended in 1914, which abolished the office of County Treasurer and provides that ''the Legislature shall provide by law for the care and custody of all county funds and shall provide the method of reporting and paying out all such funds.'' This quoted organic provision affords ample authority for the statutes making the collection and disbursement by State officers of statutory license taxes levied by statute for county purposes, and there is no other provision of the Constitution which negatives such authority or limits or regulates such collection and disbursement by State officers of license taxes levied by statute for county purposes. The collection and disbursement of taxes levied by the statute for road district purposes, and the custody and disbursement of taxes levied for the payment of county and district bonds issued under statutes, are for legislative regulation. Abstract principles of local self government cannot interfere with the operation of the Constitution or of valid statutes. State ex rel. v. Johns, 92 Fla. 187, 109 So. R. 228.

The Constitution does not regulate or specifically limit the inherent and express power of the Legislature to levy ''a tax on licenses,'' and the Legislature has authority over the counties and districts and over all public roads in the State. The roads are for general public use without reference to county lines, and there is great inequality among the counties in public road burdens and in taxable resources.

Where license taxes on gasoline used in motor vehicles on the public roads, are levied by statute, uniformly throughout the State to be collected by State officers as statutory funds to be apportioned among the counties and used for public road purposes in all the counties of the .

State, such taxes are not levied for State purposes, nor are they levied by the counties for county purposes but they constitute a separate and distinct statutory license tax fund and it does not clearly appear that an apportionment among the counties of the proceeds of such statutory license taxes so levied and collected, in the proportion as such license taxes are collected in the counties severally, is, in view of the law and of the facts above stated, the only rule of apportionment that is permissible under Sections 1 and 5, Article IX, or other provisions of the Constitution. The Constitution requires geographic uniformity and equality in the rate of taxation, not in the application of tax funds to public purposes that are geographically not uniform or equal. The legislative power of a state is limited by the State and Federal constitutions, but not by theories of local taxation.

A statute must be construed, if fairly possible, as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score. United States v. Jin Fuey Moy, 241 U. S. 394, 36 Sup. Ct. R. 658; Missouri Pac. R. Co. v. Boone, 270 U. S. 466, 46 Sup. Ct. R. 341, 70 Law Ed. 688; Burr v. Florida East Coast R. Co., 77 Fla. 259, 81 So. R. 464; In re Seven Barrels of Wine, 79 Fla. 1, 83 So. R. 627; Pompano Horse Club v. State, 93 Fla. 415, text 457, 111 So. R. 801; Hires v. Mitchell, 95 Fla. 345, 116 So. R. 81.

The members of the Court all agree that the primary statutory apportionment of the ''second gas tax'' among the counties as collected therein severally, is valid; and that two-thirds of the ''fourth gas tax'' should be apportioned as required by amended Section 7, Article XII, Constitution, in the absence of appropriate statutory regulations under amended Section 9, Article XII. Where a fund for county school purposes has to be *distributed*

*among the counties,* the applicable *organic* rule of "apportionment and distribution" controls. Board Pub. Inst. v. Croom, 57 Fla. 347, 48 So. R. 641, State ex rel. v. Barnes, 22 Fla. 8.

In view of the questions raising doubts as to the constitutional validity of the *primary apportionments* made by the statute of the "third gas tax" and of one-third of the "fourth gas tax," and as there are express alternative provisions for such apportionment contained in the Act, in order to so apply the statute as to avoid doubts as to the validity of the adjudged apportionments and to effectuate the enactment, I concur in the holding in this case that the apportionment among the counties of the "third gas tax" as well as the "second gas tax," shall be in the proportion as the taxes are collected in the counties respectively, to be applied to stated county and district road bonds; and that one-third of the "fourth gas tax" shall be apportioned among the counties in proportion as the tax is collected in the counties respectively, to be used for public road construction in the counties severally; which adjudged apportionments are authorized and contemplated by the express alternative provisions of the Statute.

TERRELL, C. J., concurs.